Mr. Brindley, your honor. Brindley, yes, Bo Brindley. Good morning. You may proceed, sir. Thank you. May it please the court, my name is Bo Brindley and I represent the defendant appellant here, Max Julian Wright. Mr. Wright raised several issues in his briefs and I would like to address two of those this morning, the first of which was the district court's decision to limit Mr. Wright's cross-examination of cooperating witness, chief cooperating witness, Deshaun Anderson, regarding the penalty he would have faced had he not cooperated and received a deal from the United States. The district court did not allow counsel to question Mr. Anderson regarding the fact that pre-cooperation and without cooperation, Mr. Anderson would have received a you would receive decades in prison. It is, first of all, very important to note that Mr. Anderson was going to receive decades in prison either way. He got decades in prison with the deal, so that statement, being able to ask that question, gave the jury no sense in which it could actually differentiate between what he would have gotten pre-cooperation and what he got afterwards. And the case law on this is very clear. In the Caldwell case that we decided, Caldwell made clear that the pre-cooperation exact sentence that the cooperator would receive has to be provided to the jury so they can evaluate the nature of his bias and motivation. In Larson, in the Ninth Circuit, the district court looked at the exact kind of question that was permitted here about an extensive prison term and they reversed. They said a life term is different and you have to tell them that it's life. There's nothing else like it. In Roan Eagle, here in the Eighth Circuit, it was not even a mandatory life, it was a potential life sentence. And this court said in Roan Eagle that is not sufficient to simply say it would be some extensive penitentiary term. You have to permit the actual sentence, life, to be stated to the jury. And the very concerns that motivated the district court... Hold on, do any of those cases involve a situation like we have here where it's pretty clear that the defense was also trying to get in front of the jury improperly, what the defendant was facing? Judge, yes. In fact, in Roan Eagle and in Larson, the exact same kind of concern was raised. The concern was by questioning the witness regarding the prior sentence in this way, the jury is going to know what the defendant's going to get. It was the exact same logic in both of those cases and it was found to be insufficient. No improper questions were asked of Mr. Anderson. Mr. Anderson, if you look at the cross examination, was a very, very evasive and difficult witness. The question that was asked was trying to pin Mr. Anderson down to the admission that he knew he really was going to get mandatory life because he had a prior conviction. And before we could get to the ultimate question of what the sentence was, the objection was made and the district court intervened. There is no sense in which anything, any improper question was asked. Not an irrelevant question, not an improper question. In fact, the first question. And so there is no sense in which this can be distinguished on that basis. When the very same logic, we're worried that the jury is going to find out Mr. Wright will get life too, mandatory, and have sympathy for him. That was the same thing that they were worried about in Roan Eagle. That was the same thing they were worried about in Larson. And the Eighth and Ninth Circuits have said no. Yeah, but in this situation, the defense counsel, I don't know . . . It was me, Judge. Defense counsel brought out the fact that it was based, that he was going to get this man or faced a potential mandatory life based on a prior conviction, right? Yes. And of course, it was going to come out later that the defendant had a prior conviction. Now, had we left out, had we not put in the predicate that it was based upon a prior conviction, one could have just asked, are you facing life imprisonment? If you'd have left out that predicate, then it would have been impossible for the jury to connect the dots and you wouldn't have had this problem, right? I don't agree with that. I mean, that's what the district court found, isn't it? That was part of what the district court found. That was not . . . The district court added that as an aside. That was not the principal reason. The district court's principal reason was that the jury might determine that Mr. Anderson was facing life term. The fact of the matter is that asking the question about because you have a prior conviction, that was going to pin or cordon Mr. Anderson into a position where he was going to have to answer specifically that yes, he knew he was facing the life term. Otherwise, we're going to have to fence with Mr. Anderson for a long time as we did with almost every other question that was asked to try to get a simple answer that yes, he knew that. He was not willing to admit much of anything without significant pinning in question by question. And that question, whether the fact that it was his prior conviction, that he had a prior conviction, that went to his bias and credibility too. He has a prior conviction. That prior conviction means that he's got more trouble. People look more disfavorably on somebody that's got a prior conviction and it contributes to his life term. So that needed to be asked anyway. That's a relevant question because it goes to his credibility, period. And so it was appropriate either way. And it did not allow for the violation of Mr. Wright's Sixth Amendment right to confidentiality. But you also made the link between that prior conviction and the mandatory life sentence. I don't think the mandatory life sentence question ever actually got asked like that. Well, that was the desire. Well, the desire was to say you have a prior conviction. And as a result of that, yes, you're facing a mandatory life term. Absolutely. Because there was no way for him to say anything but yes. He had no choice. He was going to have to say, oh, yes, that's true. That locked me into it. Otherwise, he could say, oh, I don't know. I don't understand. Which is what he said about everything. The only way to cross-examine this person effectively was to address him in that fashion. And there was nothing improper. If there was something improper about it, perhaps it would be a different situation. But it was perfectly relevant. No one objected to that part. Well, by making that link, didn't you put the district court in a difficult position? Because you'll agree with me that as a general rule, the jury is not entitled to know what your client's sentence is going to be. Yeah. I agree with that. OK. I do agree with that. So the district, because you made that link, the district court was kind of in a difficult spot, wasn't it? I don't agree. I think that the district court was in the same spot as we would have been if the jury's told, well, you're going to get mandatory life because there's overdoses. And you could have said it that way. And they'd be in the same position. The fact is, everybody in that jury knew that Wright and Anderson committed the exact same crime. You could have left out the predicate, and they would have come to the exact same conclusion. And I think the objection would have been made anyway. I think that's sort of an excuse rather than a justification. I don't think it's a justification sufficient to violate his Sixth Amendment right to confrontation and treat him differently than every other defendant has been treated in a similar circumstance throughout the circuit courts of the United States. And I also think it's important. This is not harmless as far as to Mr. Anderson. Because under Van Arsdale, if you find this is error, which I think that it clearly is based on the case law, if you find it's error, then you have to maximize the error's force, meaning you would disregard Mr. Anderson's testimony. The problem is, well, there were lots of other witnesses. All of the other witnesses were asked explicitly and admitted that they did not know what the agreement between Anderson and Wright was. They did not know which transactions were Anderson's independent transactions and which were Wright's. All of the overdoses were situations where they called, what the person they called to get the drugs is the person that delivered them. It wasn't one of these where they called the one guy and the other guy came, which gave rise to the best evidence of conspiracy in this case. So to get to the overdoses as being part of the collaboration or within the scope of the conspiracy to combine acts of the two men, which it must be, to get the overdoses in, you had to have Anderson because he's the only one who said it. Likewise, to get in that, in fact, these are like 0.1 gram transactions. To get them accumulated to 100 grams, you needed Anderson to say, yes, these were all part of the collaboration because all of the other witnesses admitted they could not do that. So if this is error, and we believe it clearly is, then if it is error, then Mr. Anderson's testimony would have to be disregarded and it cannot be proven harmless beyond a reasonable doubt. The second issue that I'd like to address is the issue of the Brady violation. The evidence was, as the district court found, plainly suppressed. The evidence was plainly beneficial, and the district court was rather harsh in its criticism of the government for not knowing this and not getting this evidence disclosed. One thing that the district court did that I think is incorrect from the beginning is its application of the standard. The district court indicated that even if you take out the four witnesses- Can I ask just a quick preface question? There was a recent motion to supplement filed by the government that goes to this Brady question, I believe. Do you intend to oppose that? I don't really oppose it insofar as it turned out that we both were under the impression that the information about Mr. Gavin having cooperated generally, there was a question about that in the grand jury. I don't dispute that. It's in the grand jury. What was not disclosed is the more important fact that he did his cooperation with the very same officer that's talking to him about Mr. Wright, and so he has a history with this officer of getting benefits when he gives that officer what he wants. His name was Jernigan, the officer. That part wasn't disclosed, so I don't think the supplement makes any difference, but I don't disagree with Mr. Chatham's position. And you don't oppose the motion? No, I do not. With respect to the standard, he said, the district court, that even if you take out the four witnesses, then what is left is enough to convict. And Kyles had made clear that it is not a sufficiency of the evidence standard. That is not how you do it. And then when the district court evaluated the evidence, what he said was, I'm not going to look at all the credibility problems, impeachments that were presented by the defense.  That is taking the evidence in light most favorable to the government. That is not what you do in the Brady context. That is an error of law and abuse of discretion that I think requires that the case be remanded so the proper standard can be applied to begin with. When it comes to the question of materiality, again, I think the key is the scope of the conspiracy must include 100 grams and must include these overdoses. And when you take out these four witnesses, and we went through it in detail in the briefs to do the numbers, when you take out these four witnesses, there's no way you can then say with confidence that you can get to 100 grams or that you can get all these overdoses included within the scope of the conspiracy. These witnesses were essential. The other thing I think is important is that what this established was that law enforcement had a pattern with these witnesses. There were multiple witnesses, Schlieman and Kiefer, Gavin, who were in a position, if we had all the information, to know that they could deal with law enforcement, they could get out of trouble, they could go on using heroin and then get in trouble again, and then they had a motive to be in good with law enforcement because they would be able to continue to use heroin, which was important to them. And that motive and that situation with law enforcement that applied to them may have applied also, although we don't know, to the other addict witnesses. And if the jury saw that, well, Schlieman and Kiefer had previous relationships to these same officers, and then they added that to the fact that these witnesses commonly would admit at the beginning they weren't talking about Wright and Anderson, Anderson working for Wright. They only did that when they knew that's what the government wanted to hear about. They admitted it over and over again. If the jury saw that this was going on and these people actually had history with law enforcement, and they saw that when these people sat in the chairs and said, well, I any reason to try to help law enforcement, that they weren't telling the truth when they gave that testimony. The jurors could have then disregarded other addict witnesses as potentially having the same problem. So it didn't just infect the four. It infected them all. And because of that, there's no way to say with confidence that the jury would have found the 100 grams and the overdoses, specifically because we know the government asked the jury for a higher finding of the crack, and they chose not to. So there was skepticism in this jury. And for that reason, I don't believe anybody could say with confidence that there's not a reasonable probability that you'd have a different finding, at least on the quantity and the overdoses that are absolutely essential to the sentence received by Mr. Wright in this case. Thank you. We'll hear from the government, Mr. Chatham. Chatham, your honor. Chatham, Chatham, I'm sorry. You may proceed, sir. Thank you. May it please the court. I'd like to start off by starting where counsel did in his argument on the limitation of the cross-examination of Deshaun Anderson. And I think, Judge Grunder, you've hit on exactly the right point here. The defense counsel in this case engaged in a course of questioning of that witness that the district court clearly found was intended to put the defendant's own penalties in front of the jury. And the specific question was, you know that after they increased the charges to conspiracy with overdoses and deaths, you knew that with a prior drug dealing conviction, the only sentence, and then that's when the objection was interposed. I think counsel's argument that we didn't object to the fact that he had mentioned that Mr. Anderson had a prior drug or felony conviction, that's obviously impeachment. A felony conviction is certainly permissible as an impeachment matter under the rules of evidence. As the Thomas case says, though, the defendant's own penalties are not. The district court at the moment, and then again in the post-trial motion, found that that question was intended to put the defendant's own penalties in front of the jury. It put the court in a bind. And the court came up with a reasonable resolution to resolve that particular issue. And what's important here, I think, is the... Part of bias cross-examination is to get out the maximum potential sentence that the witness is facing and what the deal is. And I'm not sure decades quite gets... You know, I think counsel's correct. It doesn't really say this is the difference of what you're facing because of your testimony here. And it undermines the ability to get it biased. It put the district court in a tough spot. It did put the district court in a tough spot. And if the questions had been asked in a different way without the leaders, I think that, you know, there probably wouldn't even have been an objection. You were facing a life sentence, even facing a mandatory life sentence. But then you struck this plea agreement. Then you, you know, now you're not facing that. That would have been appropriate here. And I would disagree that... And I'm not arguing that... But, you know, I can understand counsel's argument that when you got a difficult witness, sometimes you got to kind of force it down their throat before you get them to admit it. Maybe it would have been better to initially go right to what you say are you facing. And then if he denied that, then maybe come back to the predicates for it. But it's a tough business when you're on your... Standing on your feet because, you know, doing cross-examination. It's... Hindsight's 20-20. I agree, Your Honor. And I think... I think I would disagree with the characterization of Mr. Anderson. I know there was... There were sort of a back and forth. It was a very lengthy cross-examination. But I don't think Mr. Anderson at any point attempted to minimize the severity of the charges that he was facing. And so saying that those questions were designed to cabin him in, I just don't think is necessarily consistent with the record that he would answer the question, and I think did answer the question after the sidebar, that yes, he was facing a mandatory minimum of decades in prison. And so I think he would have... Answered that question. But I think, again, the key to this particular issue is the standard of review. We are looking at whether it's an abuse of discretion. And when we're looking at the Van Aresdal standard that talks about the district court having wide latitude to impose reasonable limits on cross-examination, specifically based on concerns of prejudice or confusion of the issues. And the Thomas case that talks about the fact that penalties, the defendant's penalties aren't supposed to be in front of the jury, specifically says that's because it would be confusing to the jury. Suddenly... And in this case, I think that confusion is even more pronounced because by asking the question in that way, putting it in front of them, it effectively would turn this jury into a sentencing jury. They would know what penalty... The penalty that they would be... If they made all the findings would be that. Mr. Brindley listed a handful of cases, some of which I think are a circuit cases that compels a finding that these are error. Is he right? He's correct that those cases touch on this issue, but they do not compel a finding that these were error. Was this case different from Roan Eagle? It is different from Roan Eagle in a couple of different ways. First of all, Roan Eagle involved a pretrial ruling that basically there would be no discussion of the type of crime or the reduction in sentence. This was something that happened well before trial. And it was mentioned in Roan Eagle that this wasn't a situation that it just came up and the thrust and parry of litigation or in the heat of the moment, I believe is the phrase that was used by the court. I think that's somewhat important that this was something that we contemplated before, that these witnesses weren't going to be asked about the type of crime that they pled to or the sentences that they've received. There's discussion in that case about that, but there's no... First of all, the issue of whether the defendant's penalties would be touched upon in that way, I think was acknowledged by the Roan Eagle Court and that was one of their concerns. And I don't think that that wasn't determinative of the particular opinion. Because ultimately, the court found that the error was harmless in that case. One case, the Caldwell case, I don't think necessarily applies. Yes, the Caldwell case says that the defendant has the right to contrast the penalties faced by the witness, but the Caldwell case didn't involve an instance where the defendant's own penalties would then be put before the jury. So I think it's of limited value, the court's comments on that. More to the point, I think, is the Wally case, which is cited both by the district court and in our brief, where the court, just in 2009, found that there wasn't an error in limiting the cross-examination on a range which was five years up to 40 years, a mandatory five years and up to 40 years. There, the court allowed a reference to a significant sentence. And this, again, was on the basis of the concerns of, well, the jury might be checking out the, or determining the actual penalties of the defendant in the case. That was a concern in Wally. And the court in that case found there was no error in limiting that cross-examination. And again, that case was? Wally. Yes, W-A-L-L-E-Y. And so, and I think of note in Wally, the majority opinion cites the concurrence from the Larson case out of the Ninth Circuit, and the concurrence basically found, as Wally did, that there can be some reasonable limitation put onto the cross-examination, particularly when there's this concern of confusion of the issues. And I would also think that, I would also argue that the conclusion in Wally and the Larson case, what Larson effectively holds is that when an individual faces a mandatory life imprisonment, that the jury has to hear that. Well, that's inconsistent with the Van Arsdal standard of the district court having wide discretion to put reasonable limits on the cross-examination. And I think that's amply seen, and there are lots of different examples given in the Larson concurrence that talked about some of the problems with that. But I think that's another issue, the fact that it's just inconsistent with what the Supreme Court has said the district court's role and ability is under those circumstances. And so this is a case where not only, and I'll mention here, not only was the district court correct in imposing that reasonable limitation, because not only, and to get back to one of the questions you asked earlier about the difference between a life sentence and this decades in prison phrase, context is important, obviously, here, as always. And Mr. Anderson, who's a 44-year-old man, drug user, has lived a pretty rough life, and I think that was before the jury, pretty clearly. And so the idea that he faced a mandatory minimum of decades in prison at that station in his life and where he was at, he's a bit of a rough customer. The jury in this instance, there's an ability to fairly apprise the benefits obtained by his plea agreement. Let me ask you, was the jury informed that it was a mandatory minimum of decades, or just that he was facing decades? Mandatory minimum of decades, Your Honor. And was it clear that by testifying, he no longer faced a mandatory decades? The truth is that he did face, he faced a mandatory 20 years without the 851 enhancement. He was at 20 to life. And so- That was his only deal, was dropping the enhancement. It wasn't also a 3553E and a 5K1? There was no particular agreement for any 5K1.1 or 3553E. Mr. Anderson was sentenced after Mr. Wright's trial, ultimately sentenced, I believe, to 20 years with no e-motion made, but a 5K motion made. So, and as it's relevant in this, to the cross-examination, though, Mr. Anderson did not know what potential benefit he would receive. He understood that he wasn't looking at a mandatory life, but he didn't know what his ultimate sentence would be. And based on the cross-examination that was allowed, the jury was fairly apprised of the benefits of this plea agreement. And I'll also mention here, the district court also found harmless error on that issue, and I don't believe that was an abuse of discretion. Let me ask you, if you applied a harmless error analysis, would it have to be harmless beyond a reasonable doubt? I believe so, Your Honor. And I think Mr. Brindley is correct that if there was a Confrontation Clause violation found with respect to Mr. Anderson, that you would no longer consider Mr. Anderson's testimony. But on the other hand, we have the testimony of the 14 or so different witnesses who testified as to their perception of the arrangement and agreement between the defendant and Mr. Anderson. And the way this has been argued by counsel, and I know this is sort of on to the other issue, and I can jump there here as well, is that nobody else knew the agreement between the two of them. Well, we're not required to have direct evidence of that agreement. In this case, there was overwhelming circumstantial evidence of that agreement. And as a district court found, witness after witness came up and testified that you would call one and the other would show, or they knew that there was some relationship between the two of them. They didn't know exactly the particular relationship as far as salaries and whatnot, but they certainly did testify as to the relationship that they perceived. Mr. Brindley also argues, though, that you can't get to the minimum amount of drugs, minimum quantity, that was pled in the indictment without that testimony as well. I would disagree with that. Now, certainly Mr. Anderson's testimony put far in excess of 100 grams in this. I think it was turning around that almost every couple of weeks, I believe his testimony was. But the other witnesses did testify to dealing with Mr. Wright and Mr. Anderson over the course of years. I don't necessarily agree with the calculations, every calculation made by counsel as far as the quantity to attribute to each and every witness. But ultimately, the issue of the drug quantity is, again, more of a harmless error issue anyway, because the sentence in this case is driven by the overdoses and the deaths and serious bodily injuries. Ultimately, the jury's quantity finding didn't have any impact on the defendant's ultimate sentence, because with the prior conviction, the 851 notice that was filed, if the jury had found any single serious bodily injury or death, it was a mandatory life. In this case, the jury found six injuries and two deaths that were attributable to the conspiracy and to the defendant. When going through each individual overdose incidents, they are not tied into specifically Mr. Anderson's testimony or specifically the singular testimony of the other witnesses involved in the Brady issue. There are at least three, well, three and a half, four incidents, both of the deaths, and then one death was actually, or one victim was actually charged with both a serious bodily injury and a death, because she was found in a critical condition on one day and passed away a few days later. And the jury found that the distribution or the conspiracy resulted in both her injury on the day of and then death a few days later. And so that would be Ms. Morgan. But there's an overdose involving Mr. Hill, and there's another overdose involving Lawrence Michaels, that those have nothing to do with these witnesses that had any of the issues with respect to the impeachment information. Now, with respect to this Giglio issue, per counsel's concession that the defendant did in fact have Mr. Gavin's grand jury testimony, that I think puts the argument writ large in a different light. Certainly with respect to Mr. Gavin, we don't believe that the idea that it's the same officer as opposed to just cooperating with law enforcement generally, that that has any material benefit or any substantial, it doesn't really move the needle on the impeachment value of that particular information. Not to mention Mr. Gavin cooperated in this case, was clearly seeking some benefit from his testimony because of the fact that he had provided the information or the heroin to Mr. Bolton. Likewise, with Ms. Kiefer, her prior cooperation isn't really material. Ms. Kiefer came into the case because she was the victim of an overdose. She was found at the scene nearly dead, brought back to life, and was asked questions. So it wasn't known at the time to the prosecution team, although it was certainly within the government's possession, that she had previously worked with the Cedar Rapids Police Department. But that really doesn't impact the status of her in the case and the effect of that information on her testimony. And likewise, with Ms. Schlamann, I know my time is running out, but I'll just mention with Ms. Schlamann, she was brought in sort of off the street, not facing any particular charges, was cross-examined about her potential bias on all those issues as well. Time is up. Very well. With respect to the question of the overdoses and the harmlessness of Mr. Anderson's testimony is discounted, none of the witnesses, none of the other witnesses could say that the overdoses were part of the conspiracy or the collaboration because none of the overdoses involved calling Anderson and having Wright come or calling Wright and having Anderson come. You had to have Anderson for that. It does have to be proven beyond a reasonable doubt because it's a constitutional error pursuant to Chapman v. United States in the Supreme Court. And I do not think there's any way to meaningfully distinguish this from Roan Eagle. It's the exact same logic. The Wally case, if you look at it, and it's cited at page 49 of my original brief where I quote Wally, what they were talking about in Wally was the fact that the difference between two and five years was so small that it sort of was negligible. It doesn't really apply to a mandatory life situation. And Roan Eagle and the other case law says that what the judge did here on that, if I could have just a second to finish, what the judge did here on that, that's not sufficient. And so we would ask that the case, the conviction be vacated and the case remanded. Thank you for the argument. The case is now submitted and we will take it under consideration. Thank you.